IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Patricia A. Kimbleton,                           :

              Plaintiff           :          Civil Action 2:10-cv-559

    v.                                      :          Judge Watson

Commissioner of Social Security,        :          Magistrate Judge Abel

            Defendant          :

## REPORT AND RECOMMENDATION

Plaintiff Patricia A. Kimbleton brings this action under 42 U.S.C. §405(g) for review of a final decision of the Commissioner of Social Security denying her application for Supplemental Security Income.  This case is now before the Magistrate Judge for a report and recommendation on the disposition of this matter.

**Summary of Issues**.  Plaintiff Kimbleton filed an application for supplemental security income in September 2005, stating that she had been disabled since August 2005, at the age of 44, by depression, asthma, arthritis in all joints, broken left ankle, four broken toes of the left foot, broken right wrist, anxiety, and being developmentally slow.  The administrative law judge ("ALJ") found that Kimbleton retains the ability to perform a range of light work that included a significant number of jobs.

Plaintiff Kimbleton now argues that the decision of the Commissioner

1

denying benefits should be reversed because the ALJ had erred in finding that she did not meet the requirements of Listing 12.05C, because the ALJ's findings that she could perform light work were not supported by substantial evidence, and because the ALJ failed to set forth specific reasons for rejecting a doctor's opinion concerning her functional limitations.

**Procedural History**. Kimbleton filed her application for supplemental security income on September 14, 2005, alleging disability beginning August 15, 2005. Her claim was denied initially and upon reconsideration. (R. 13.) She sought a *de novo* hearing before an administrative law judge. On November 18, 2008, an administrative law judge held a hearing at which Kimbleton, represented by counsel, appeared and testified. (R. 323.) A vocational expert testified. On November 28, 2008, the administrative law judge issued a decision finding that Kimbleton was not disabled within the meaning of the Act. (R. 13-24.) On May 25, 2010, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security. (R. 5-7.)

**Age, Education, and Work Experience**. Kimbleton was born on July 7, 1961, and was 44 years old at the time at which she alleges she was disabled. (R. 43.) She attended school through the sixth grade; although her school system recommended special education, she was not placed in it. She has no past relevant work. (R. 61.)

**Plaintiff's Testimony**.  The administrative law judge fairly summarized

Kimbleton's testimony at the hearing as follows:

> Activities of daily living include adaptive activities such as cleaning,
> shopping, cooking, taking public transportation, paying bills,
> maintaining a residence, caring appropriately for grooming and
> hygiene, using telephones and directories, and using a post office. . . .
> [T]he claimant is capable of caring for herself, her disabled husband
> and her two children still living at home. One of her children is
> disabled with cystic fibrosis. She is able to perform household chores
> such as cooking, cleaning and laundry. She goes grocery shopping. She
> does not drive because she never learned how, but gets rides from
> family members as needed. She listens to music and reads her bible,
> but no longer watches television as she does not like the language used
> or the messages that shows convey.
>                                    . . .
> The claimant relates that she has chronic back pain which she
> described as achy and constant.  She has problems getting out of bed.
> She reports that pain medications help and the pain goes away when
> [sic] lays down and elevates her feet.  An MRI of the claimant's cervical
> spine, dated February 2006, showed mild degenerative changes and an
> x-ray dated June 3, 2008 revealed mild spondylotic changes.  An x-ray
> of the claimant's lumbar spine showed some degenerative change at
> the sacroiliac joint.  The claimant has not recently been to a specialist
> for evaluation or treatment.
>
> She describes having hand and arm problems.  The claimant is right
> handed.  She testified that when she tries to write or move her hands,
> they cramp causing her to drop items.  She reports that she cannot
> functionally hold items and described experiencing hand numbness a
> couple times a month.  The record reflects that the claimant
> participated in an evaluation with Gerard M. Papp, D.O. for pain in
> her left wrist and left elbow.  An MRI of the claimant's left wrist was
> non-specific.  She fractured her right wrist and left small finger in May
> 2001 which apparently healed.  The record does not document any
> electromyographic testing regarding the claimant's upper extremities.
>
> She states to [sic] having knee pain when she uses stairs or bends her
> knees.  The pain generally goes away when she changes position.  The
> record also indicates that the claimant sustained a left ankle fracture
> in 2000.  She also reports having a breathing problem and that is
> triggered by environmental causes.  She uses an inhaler and uses a

nebulizer about three times a day.  The record does not reflect any pulmonary function testing and the claimant reports not seeing a breathing specialist.  She described that her shortness of breath is exacerbated by environmental irritants and some activity.  It has also been considered that the claimant is obese at 62 inches tall, weighing approximately 264 pounds, which could cause or contribute to impairments of the musculoskeletal and respiratory systems.  She also describes having macular degeneration; however, the record fails to document this.

The claimant also describes mental health impairments and she also continues to struggle with bereavement issues surrounding the loss of her son in June 2002.  She thinks a lot about "her baby" and notes that "a lot of things out there" remind her of her deceased.  She describes feeling blue almost everyday and that it usually lasts until she talks to someone.  She talks with her daughter, friends from her church or her pastor.  She described getting distracted and forgetful.  She participates in counseling with her pastor.  She attended a mental health assessment with NetCare, but states that she did not follow-up due to transportation issues.

With respect to the nature of the claimant's symptoms, precipitating and aggravating factors, the medications taken and any side-effects, and other measures used to relieve the symptoms, the claimant testified that she takes her medications as prescribed and experiences no side effects.  She gets all her medications from Charles J. Kistler, D.O.

(R. 16 and 19-20, citations omitted.)

Kimbleton lived with her family, cooked, cleaned, did the laundry, and took care of her husband and two children (R. 66-69 and 344). She went for walks with her husband and child, read the Bible, went to church three times a week, shopped, and visited daily with her family (R. 67, 69-70, 341-42, and 344-46). Plaintiff testified she had not tried to work because she had children at home that are and were ill (Tr. 328).

**Medical Evidence of Record**.

4

This Report and Recommendation will summarize the relevant medical evidence of record in some detail.

**Physical Impairments**.

Charles Kistler, D.O.  Dr. Kistler had apparently treated Kimbleton regularly as her physician since November 7, 2003.  (R. 146.)  As noted in the analysis below, however, the medical record in evidence does not actually appear to contain Dr. Kistler's own treatment records.

Dr. Kistler stated in a May 27, 2004 teledictation that he had diagnosed Kimbleton with gastritis, urinary incontinence, degenerative joint disease of the knees, obesity, sinusitis, depression, psychosis, and low intelligence quotient.  He stated that she was mildly retarded and that she had degenerative joint disease of the wrist, ankle, and foot.  (R. 146.)  Dr. Kistler further opined that Kimbleton was "permanently and totally disabled from a physical and psychological standpoint and continues to be so."  In a December 1, 2005 teledictation, Dr. Kistler again listed Kimbleton's diagnoses, including MRDD, carpal tunnel syndrome, chronic low back pain, wrist problems, fractured ankle, broken toes, arthritis, and developmental delay.  (R. 206.)  He repeated his opinion that Kimbleton was "permanently and totally disabled from sustained remunerative employment from a physical and psychological standpoint."  In an August 25, 2006 teledictation, Dr. Kistler included amongst Kimbleton's diagnoses minimal brain dysfunction, lateral epicondylitis in the left elbow, Kienbock's disease of the left lunate, trapezius strain, sprain and strain of the knees, and back pain.  He again opined that she was totally disabled.

5

(R. 249.)

In an October 17, 2008 letter to Plaintiff's counsel, Dr. Kistler listed Kimbleton's "ongoing working medical diagnoses" as degenerative disk disease of the dorsal spine, degenerative disk disease of the cervical spine with herniated disk at C5-C6 and covertebral arthritis, degenerative joint disease of the left and right knee, depression, anxiety, psychosis, asthma, epicondylitis of the elbows and cardiac arrhythmia. (R. 291.) He referred briefly to his most recent physical examination of her on October 16, 2008, in which Kimbleton had complained of joint problems and herniated disks in her neck. Dr. Kistler also diagnosed Kimbleton with Kienbock's disease of her left wrist and bilateral lateral epicondylitis of the elbows, as well as degenerative joint disease of the knees and sacroiliac joints. He repeated his opinion that Kimbleton was permanently disabled. (R. 292.) Dr. Kistler also provided a form residual functional capacity assessment, in which he opined that Kimbleton could occasionally lift up to 20 pounds and carry 10 pounds, that she could occasionally bend, climb, or reach above shoulder level, but that she should never squat. She was totally barred from activities involving unprotected heights, machinery, or exposure to dust, fumes, and gases, and was moderately restricted in her exposure to marked changes in temperature and her ability to drive automobile equipment. Dr. Kistler further opined that Kimbleton could sit for two hours per day, and stand and walk for half an hour, although these were only with rest. (R. 293-94.)

Keith A. LaDu, D.O.  On December 1, 2000, Dr. LaDu performed surgery on

6

Kimbleton for multiple fractures of her left foot.  (R. 193A.)  Upon follow-up later that month, Kimbleton reported occasional muscle spasms, but that she was generally doing well.  (R. 186.)  At four later follow-up appointments, Kimbleton stated that she had been doing well and denied any complaints.  (R. 182-85.)  On April 30, 2001, she reported to Dr. LaDu that she had fallen down some stairs and fractured her right wrist and left small finger.  These were splinted.  (R. 181.)  However, upon follow-up two weeks later, Dr. LaDu found that her finger had re-fractured, as well as a bony destruction of the left lunate consistent with Kienbock's disease.  (R. 180.)  Dr. LaDu recommended surgery on Kimbleton's finger, although she was uncertain whether she wished to pursue surgery.  She eventually cancelled the scheduled surgery on her finger.  (R. 179.)  At a follow-up appointment on June 21, 2001, Dr. LaDu diagnosed Kimbleton with Kienbock's disease on her left wrist, and recommended follow-up.  He also recommended range of motion exercises for her right wrist.  (R. 176.)  At her next follow-up appointment on July 12, 2001, Dr. LaDu referred Kimbleton to formal physical therapy for her right wrist, with a recommendation that once she had restored full range of motion in her right wrist she consult with a hand surgeon with respect to her left wrist.  (R. 175.)

Gerard M. Papp, D.O.  Kimbleton was referred to Dr. Papp by Dr. Kistler for a complaint of left wrist pain and left lateral elbow pain, especially with extension of the elbow.  (R. 203.)  Kimbleton reported at a July 15, 2004 examination the onset of left elbow pain a month prior, although she denied any specific fall or injury.  She also reported associated weakness and numbness of the elbow.  Dr.

7

Papp found good range of motion in her cervical spine, but tenderness to palpation over the common extensor origin of her left elbow, with pain with resisted extension of the left elbow and decreased extension. He reviewed recent x-rays of her left wrist, which revealed evidence of sclerosis of the lunate with loss in the axial height, narrowing of the lunate radial joint and a beginning carpal collapsed type picture. (R. 204.) Dr. Papp diagnosed Kimbleton with acute lateral epicondylitis and tennis elbow in her left elbow, as well as Kienbock's disease in her left carpal lunate. He performed an injection of the common extensor origin and recommended ice, anti-inflammatory medication, and a follow-up re-evaluation. Dr. Papp also recommended watchful waiting with respect to her left wrist, with the possibility of future evaluation by a hand surgeon. (R. 204.)

Robert C. Woskobnick, D. O. Dr. Woskobnick examined Kimbleton on June 28, 2004 at the request of a state disability determination agency. Kimbleton reported to him that she was filing for disability for several complaints, including back pain, left elbow pain, and left wrist pain. She claimed a history of left foot and ankle pain following a left ankle fracture, and bilateral knee pain with the left being worse than the right. She reported trouble standing and walking. (R. 147.) Dr. Woskobnick completed a neuromusculoskeletal exam, finding decreased grasp, manipulation, pinch and fine coordination of the left upper extremity of the hand, as well as decreased range of motion of the dorsolumbar spine, left ankle, left knee, and right knee, with the left knee worse than the right. (R. 149.) He also found crepitus of the knees bilaterally with the left worse than the right and the left ankle

8

with some crepitus with range of motion.  His relevant diagnoses were chronic back pain, most likely degenerative joint disease or disc disease, left elbow and left wrist pain, possibly carpal tunnel syndrome, left foot and ankle pain, and bilateral knee pain with the left knee being worse than the right.  Dr. Woskobnick made the following assessment of Kimbleton's ability to do work-related activities:

> Mrs. Kimbleton because of her back pain, left elbow and left wrist pain, left foot and ankle pain, and bilateral knee pain with the left being worse than the right would be able to stand for ½ hour at a time as long as she could rest for ½ hour.  She could do this up to eight hours a day accumulative.  The claimant would be able to sit for up to eight hours a day as long as she could get up 15 minutes on each hour and stretch out her legs.  The claimant's ability to lift would be limited to 20 pounds intermittently but not continuously.  The claimant's ability to climb, balance, stoop, crouch, kneel and crawl should be restricted because of her back pain, left elbow and left wrist pain, left foot and ankle pain, and bilateral knee pain.  Physical functions of reaching, handling and pushing would not be impaired as long as the weight restriction was not exceeded.  Physical functions of feeling, hearing, seeing and speaking are not impaired.  There would be no environmental restrictions for Mrs. Kimbleton at this time as her asthma appears to be well-controlled.

(R. 149.)

<u>E. S. Villanueva, M.D.</u>  Dr. Villanueva, a state agency medical consultant, reviewed Kimbleton's record and produced a physical residual functional capacity assessment on July 27, 2004.  (R. 156-161.)  He found that Kimbleton could occasionally lift 20 pounds, and frequently could lift 10 pounds.  She could stand and walk, and sit, about six hours in an 8-hour workday, and her ability to push and pull was unlimited.  (R. 157.)  Dr. Villanueva found no manipulative, visual, communicative, or environmental limitations, although she should never attempt to

balance.  (R. 158-59.)  He explained his findings:

> Clmt uses no assistive devices and is able to ambulate freely.  CE exam reveals she can lift 20 lbs intermittently.  The exam notes the clmts ability to climb, balance, stoop, crouch, kneel and crawl should be restricted because of her back pain, left elbow and left wrist pain, left foot and ankle pain, and bilateral knee pain.  Clmt's asthma appears to be well controlled and not a limiting factor.  Clmt notes she is able to vacuum and clean her home.  Clmts most recent LS Xray showed moderate degenerative changes of the sacroiliac joints.  There was some decreased ROM in the knees, ankles, and back.  Clmt is also significantly obese which would add to mobility issues.

(R. 158.)

Dr. Villanueva stated that an examining source was on file, with which he

disagreed.  Apparently referring to Dr. Woskobnick's report, he found:

> CE exam states clmt would be able during an 8 hour day to stand for ½ hour at a time as long as she could rest for ½ hour.  This would restrict her to 4 hours a day standing and give her a Sedentary RFC.  The evidence in file shows the clmt had a normal toe, heel and tandem walk.  Her SLR was negative in both the supine and seated positions, and she does not require any assistive devices.  Her asthma is controlled with medication, and has no limiting factors.  In light of this, she should be able to stand for at least 6 hours during a standard work day.

(R. 160.)

<u>Maureen C. Gallagher, D.O.</u>  Dr. Gallagher examined Kimbleton on January

23, 2006 at the request of a state disability determination agency.  Kimbleton

reported to her that she had problems with pain in her knees when she climbed

steps or when standing for a certain length of time, and that she suffered from foot

pain.  She complained also of difficulty with lifting or carrying because of

degenerative joint disease in her neck.  Upon examination, Dr. Gallagher found that

10

Kimbleton had a decreased range of motion in her neck in extension and rotation to the right, attributable to an old motor vehicle accident, but good motor strength in her left ankle and adequate grip strength. (R. 215.) Her impressions were that Kimbleton suffered from degenerative disc disease of the neck, knees, wrists and left ankle, as well as low educational achievement. (R. 216.) Dr. Gallagher concluded, with respect to Kimbleton's physical capacity:

> She exhibited mild to moderate pain behavior. Her posture is upright. She is able to go from a sitting to a standing position and a standing to a sitting position without difficulty. Her gait is mildly uneven. She limps on her left ankle. She can bear her own weight and keep her balance until challenged. She should not be placed in positions that require unrelieved standing. Her feet cleared the floor without the use of aids. Lifting or carrying should be limited to approximately 20 pounds. She should not be placed in positions in which she is required to lift or carry repeatedly. She should not reach overhead, push or pull. She is able to manipulate fine objects. She may need accommodations in the area of manipulating repeatedly if she exhibits increased symptomatology with manipulation of fine objects.

(R. 216.)

Spinal radiograph. On February 23, 2006, Kimbleton was referred by Dr. Kistler for an MRI of her cervical spine. This revealed diffuse narrowing of the spinal canal from the C3 through C6 levels that was likely congenital in nature. It also demonstrated diffuse disk bulges at C3-4, C4-5, and C5-6 that reduced the free fluid about the cord and slightly effaced the ventral aspect of the cord at all of those levels. (R. 243.) There was no evidence of cord edema. Mild left-sided uncinate profess hypertrophy was also noted at all of those levels, resulting in a mild degree of lateral recess stenosis, as well as Schmorl's node within the superior endplate of

11

C5 with slight surrounding edema and straightening of the cervical lordotic curvature, which may be positional or due to paravertebral muscle spasm. (R. 243-44.)

Kimbleton suffered anxiety during and after her MRI. She was treated for anxiety, and returned to the hospital for a follow-up the next day, which was conducted by Dr. Karen S. Vincent, D.O. (R. 247.) Kimbleton, who was concerned about a possible stroke, complained of episodes of left-sided numbness, weakness, and pain, typically when she was up and moving around. She reported that her symptoms resolved when she sat down, and that she had no motor weakness or difficulty talking. Dr. Vincent examined Kimbleton, conducted an EKG and reviewed the recent spinal MRI. Her diagnosis was "[p]aresthesias of her left side of uncertain etiology, but at this point in time, seeing her abnormal MRI of the cervical spine, I am suspicious that it could be caused by her cervical stenosis." (R. 248.)

**Mental Impairments**.

State agency assessments. Dr. Carl L. Tishler, PhD reviewed Kimbleton's record on October 2, 2004. (R. 162-174.) He found that there was insufficient evidence in the record to make any determinations concerning any functional limitations, or to establish the presence of criteria satisfying the listings. (R. 172-173.) He stated, however:

> Clmt missed 3 total CR examinations, 1 physical and 2 psychological examinations. Attempts were made by both phone and mail in order to determine why the second Y CE exam was missed. There was no

12

contact made after the second missed CE and there is insufficient evidence to make a decision based on the mental portion of this claim. This is a failure to go to CE, N37 denial.

(R. 174.)

Dr. Scott L. Donaldson, PhD conducted a psychological evaluation of Kimbleton on December 13, 2005.  (R. 207-212.)  Kimbleton reported to him that she had completed the sixth grade, and that she had been enrolled in special education classes, but that she had dropped out of school because other kids made fun of her.  (R. 208.)  Dr. Donaldson's impressions of her mental functioning were that her ability to perform mental arithmetic and to reason were equal to the remainer of her cognitive abilities, and that she was of average intelligence.  (R. 209.)

Dr. Donaldson administered systematic intelligence testing.  On the WAIS-III (a test of intelligence), she received a Verbal IQ of 72, a Performance IQ of 73, and a Full IQ of 70.  As her full IQ score fell two standard deviations below the mean, it was within the Borderline range.  (R. 210.)  On the WMS-III (a test of memory), she received an Auditory Immediate Index of 83, a Visual Immediate Index of 78, and Immediate Memory Index of 76, an Auditory Delayed Index of 89, a Visual Delayed Index of 72, and an Auditory Recognition Delayed Index of 110.  She also received a General Memory Index of 84 and a Working Memory Index of 74.  Dr. Donaldson found that her overall memory quotient was less than two standard deviations below the mean, and therefore did not indicate a deficit.  (R. 210-211.)  On the WRAT-III, Kimbleton received a reading standard score of 68 (equivalent of

13

fourth grade), a spelling score of 75 (sixth grade), and an arithmetic score of 74

(fifth grade).  (R. 211.)  Dr. Donaldson concluded:

> As determined by her responses to queries and by her score on a
> measure of auditory short-term memory, Ms. Kimbleton's ability to
> understand, remember and carry out one- or two-step job instructions
> does not appear to be impaired.  Her ability to perform repetitive tasks
> may be limited mildly due to her medical problems; however, her level
> of motivation may be lacking moderately due to her Axis I diagnoses.
> Her ability to attend to relevant stimuli is likely to be impeded mildly.
> Her interpersonal relationship skills as well as her ability to relate to
> supervisors and co-workers, appear to be limited mildly.  Her ability to
> withstand the stress and pressures associated with day-to-day work
> activity appears to be limited mildly based upon her Axis I diagnoses.
> This client is likely to benefit from Individual Psychotherapy and a
> vocational rehabilitation program.  If the claimant were granted
> disability benefits, the examiner believes that she may need assistance
> managing her day-to-day funds, as well as with additional long-range
> financial affairs.

(R. 212.)

Dr. William B. Benninger, PhD reviewed Kimbleton's record on October 10,

2006.  (R. 222-238.)  He found that she suffered from affective disorders, mental

retardation, and anxiety-related disorders.  Kimbleton had mild restrictions on her

activities of daily living and mild difficulties in maintaining social functioning, as

well as moderate difficulties in maintaining concentration, persistence, or pace,

though the record indicated no episodes of decompensation.  (R. 232.)  Her ability to

understand and remember detailed instructions and ability to carry out detailed

instructions were moderately limited, as well as her ability to respond appropriately

to changes in the work setting, but no other specific vocational activities were

limited.  Dr. Benninger found that the evidence of record did not support the

14

presence of the "C" criteria for mental disorder listings, and, after reviewing

Kimbleton's most recent consultative examination, concluded that:

> Based on above clmnt is capable of at least simple tasks and likely some moderately complex tasks. Clmnt statements are partially credible. CE examiners opinion given weight.

(R. 238.)

### Administrative Law Judge's Findings.

The administrative law judge found that Kimbleton had the severe

impairments of cervical degenerative disc disease, degenerative joint disease,

depression, anxiety, and borderline intellectual functioning. However, he found

that none of these met or equaled a listed impairment, and specifically that

Kimbleton's mental impairment did not meet the level of severity described in

listing 12.05C. The ALJ concluded that Kimbleton retained the ability to perform

light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand or walk 6 hours in an eight-hour workday and sit for 6 hours in an eight-hour workday, with a change in position every 30 minutes. She can occasionally stoop, kneel, crouch, and reach overhead bilaterally, but is precluded from crawling. She can occasionally climb stairs, but is precluded from climbing ladders. She can frequently use her hands for fingering, bilaterally. She can perform simple repetitive tasks and complete them in the time expected. She is precluded from fast-paced activities with strict time limits or high quotas. She can interact with co-workers, supervisors and the general public for approximately 50% of the day. She would require oral instructions for tasks.

(R. 18.)

### Standard of Review. Under the provisions of 42 U.S.C. §405(g), "[t]he

15

findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. ..."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It means "'more than a scintilla.'" *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments**.  Plaintiff argues that the administrative law judge erred in failing to find that she is mildly mentally retarded and meets or equals the requirements of listing 12.05C, that his finding that she can perform the exertional demands of light work and can frequently use her hands and is only limited to reaching overhead occasionally is not supported by substantial evidence, and that he failed to comply with controlling Sixth Circuit caselaw in failing to set forth specific reasons for rejecting Dr. Kistler's opinion regarding her functional limitations.

16

<u>Analysis</u>.

<u>Physical residual functional capacity</u>.  With respect to Kimbleton's physicial impairments and residual functional capacity, the administrative law judge determined that she had the impairments of cervical degenerative disc disease and degenerative joint disease, but that neither of these were listed impairments and that Kimbleton retained the ability to perform light work subject to certain limitations.

The ALJ's opinion, however, was somewhat vague in how it addressed the physical medical evidence of record.  He addressed some specific x-ray and MRI analyses of her spine and left wrist.  (R. 19.)  He referred specifically to Dr. Papp's examination.  Finally, he rejected an opinion of Dr. Kistler that Kimbleton had limited ability to sit, stand, or walk as not supported by the claimant's testimony and "other evidence of record", and discounted Dr. Kistler's opinion that Kimbleton was disabled as being a matter reserved to the Commissioner.  (R. 21.)  Plaintiff's second and third arguments concern what she alleges is the ALJ's failure to properly consider the record as a whole in assessing her residual functional capacity and his failure to set forth specific reasons for rejecting Dr. Kistler's opinion regarding her functional limitations.

The Social Security Administration "promises claimants that ALJs 'will evaluate every medical opinion [they] receive.'" *Smith v. Comm'r of Social Security*, 482 F.3d 873, 875 (6th Cir. 2007), quoting 20 C.F.R. §404.1527(d).  The ALJ can, of course, assign different weight to different evidence in the record (subject to certain

17

constraints as to the differences amongst various sources).  However, it is axiomatic

that, as his job is to resolve conflicts in the evidence, he must present and address

the medical record.  A reviewing court cannot determine whether the ALJ carried

out his obligation to consider the record as a whole unless the ALJ shows that he

did.  An ALJ's failure to give "good reasons" for his rejection of medical evidence is

grounds for remand even if substantial evidence would otherwise support his

decision.  *Hall v. Comm'r of Social Security*, 148 Fed. Appx. 456, 461 (6th Cir. 2005),

citing *Wilson v. Comm'r of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).  The

requirement that ALJs articulate reasons for crediting or rejecting particular

sources of evidence "is absolutely essential for meaningful appellate review."

*Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984).

Here, the ALJ made no reference to the June 28, 2004 medical examination

performed by Dr. Robert C. Woskobnick at the request of a state disability

determination agency.  (R. 147-150.)  In it, Dr. Woskobnick gave an opinion

concerning Kimbleton's ability to do work related activities which somewhat

different from that adopted by the ALJ:

> Mrs. Kimbleton because of her back pain, left elbow and left wrist
> pain, left foot and ankle pain, and bilateral knee pain with the left
> being worse than the right would be able to stand for ½ hour at a time
> as long as she could rest for ½ hour.  She could do this up to eight
> hours a day accumulative.  The claimant would be able to sit for up to
> eight hours a day as long as she could get up 15 minutes on each hour
> and stretch out her legs.  The claimant's ability to lift would be limited
> to 20 pounds intermittently but not continuously.  The claimant's
> ability to climb, balance, stoop, crouch, kneel and crawl should be
> restricted because of her back pain, left elbow and left wrist pain, left
> foot and ankle pain, and bilateral knee pain.  Physical functions of

reaching, handling and pushing would not be impaired as long as the weight restriction was not exceeded. Physical functions of feeling, hearing, seeing and speaking are not impaired. There would be no environmental restrictions for Mrs. Kimbleton at this time as her asthma appears to be well-controlled.

(R. 150.) He also found decreased grasp, manipulation, pinch, and fine coordination in her left hand, and decreased range of motion in both knees and her left ankle.

(R. 149.) The ALJ failed to address this opinion evidence, or to explain the weight he gave it. In his residual functional capacity assessment, he accepted and adopted the opinion of a different consultative examiner, Dr. Maureen C. Gallagher. (R. 18, citing R. 213-216.) It is impossible to determine from the ALJ's opinion itself, however, why he gave weight to Dr. Gallagher's examination report and not that of Dr. Woskobnick.

This failure is significant, because at the hearing Plaintiff's counsel asked the testifying vocational expert, Lynne Kaufman, about Dr. Woskobnick's proposed restriction of only being able to stand for half an hour at a time:

> Q.  If I ask you to assume a person of the claimant's age, marginal education, no past relevant work, and the limitations set forth at 5F-4.
> A.  That's Doctor –
> Q.  I would have to spell it.
> A.  Okay –. You know, I wrote here in my notes, I wasn't clear about this residual profile. It was a little confusing to me when he said stand for 30 minutes, then rest half-hour.
> Q.  Right. Well, if I ask you to take it at its face value?
> A.  It appeared to be to me, if I understood it, against a restricted – I would put it more like a restricted sedentary.

(R. 356.) The ALJ then rejected consideration of the Woskobnick report on grounds that it predated Plaintiff's alleged onset date:

19

| ALJ: | Counsel, it's before her AOD anyway. |
| ATTY: | Okay. |
| ALJ: | I don't see where it helps us anyway. |
| ATTY: | Nothing further. |

(R. 357.)  It is not clear, however, why a June 28, 2004 consultative examination

which might support the proposition that a claimant was disabled due to

degenerative joint disease *earlier* than her alleged onset of August 15, 2005 would

not be medical evidence of record which an ALJ should consider.  As findings such

as whether Kimbleton can only stand for half an hour at a time affect an ALJ's

physical residual capacity determination, this is not harmless error; as the ALJ was

required to address the whole record and explain why he rejected or adopted Dr.

Woskobnick's report, it was reversible error.

The ALJ did not err in discounting Dr. Kistler's opinions, however.  Dr.

Kistler was Plaintiff's long-time treating physician, and, as such, entitled to

substantial deference.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir.

2007).  However, for the treating physician's opinion to have controlling weight it

must have "sufficient data to support the diagnosis."  *Kirk v. Secretary of Health

and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756

F.2d 431, 435 (6th Cir. 1985).  The Commissioner may reject the treating doctor's

opinions when "good reasons are identified for not accepting them."  *Hall v. Bowen*,

837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We will always give

good reasons in our notice of determination or decision for the weight we give your

treating source's opinion"); *Wilson,* 378 F.3d at 544.

Despite Plaintiff's apparently long relationship with Dr. Kistler, however, the records of that treatment consist only of three teledictated statements of diagnoses and a subsequent letter to Plaintiff's counsel describing Plaintiff, stating a list of diagnoses, and offering an opinion that Plaintiff was totally disabled.  This letter included a form residual functional capacity assessment, in which Kistler indicated that Plaintiff could stand or walk for half an hour per day, or sit for two hours, "with rest".  (R. 293.)  The ALJ discounted all of these:

> As for the opinion evidence, the opinions of Dr. Kistler as provided at Exhibits 4F, 12F, 19F and 24F, pp. 2-3, have been considered and are given little weight as these opinions are merely a recitation of a list of diagnosis's [sic] and a vague and conclusory assessment that the claimant is permanently disabled, without support of evidence of abnormal clinical and laboratory findings.  Dr. Kistler's opinion in regards to the claimant's physical residual functional capacity as provided at Exhibit 245F [sic], p. 4-5, has also been considered and is given little weight.  Dr. Kistler assessed that the claimant could only sit, stand and walk for a total of two hours in an eight-hour day, which would indicate that the claimant is essentially bedridden, which does not appear to be the case based on the claimant's testimony and other evidence of record.

(R. 21.)  Plaintiff argues that the ALJ failed to give reasons for rejecting Dr. Kistler's opinions which were supported by substantial evidence.  However, the opinion of a treating physician such as Dr. Kistler is entitled to great weight only if it is supported by adequate medical data, including medical signs and laboratory findings, and does not conflict with other evidence.  "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that

opinion." 20 C.F.R. §416.927(d)(3).  *See also Walters v. Comm'r of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997).  Dr. Kistler offered little more than lists of ailments from which he claimed Kimbleton suffered; the ALJ was well within his discretion to reject these as unsupported.[1]

Mental impairment under Listing 12.05C.  Plaintiff argues also that the ALJ erred in failing to find that she is mildly mentally retarded and meets or equals the requirements of listing 12.05C.  This listing states:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. [...]
>
> C.      A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. §404, Subpt. P, App. 1, §12.05.

--------

[1]  Plaintiff objects also to the ALJ's statement that determination of such issues as whether an individual meets an impairment listing or is disabled is reserved to the Commissioner, stating that Dr. Kistler had not offered such opinions.  (Doc. 11 at 26.)  Dr. Kistler, however, did so in every teledictation or letter:

> It is my medical opinion, based on the history given to me and my examination and treatment of this patient and her physical testing, that she is permanently and totally disabled from sustained remunerative employment solely as a result of her documented physical and psychological problems.

(R. 292.)

In his opinion, the ALJ found:

> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. Although the claimant achieved a full scale IQ of 70 on testing with the Wechler Adult Intelligence Scale – Third Edition (WAIS-III); after clinical interview, the consultative evaluator had assessed the claimant with average intelligence. Further, the record fails to establish that the claimant experienced significantly subaverage general intellectual functioning which initially manifested during the developmental period.

(R. 18.)

Plaintiff and the Commissioner are, on this issue, arguing at somewhat cross purposes. Listing 12.05C has three elements: (1) that the claimant have a valid IQ of 60 through 70, (2) that the claimant also have a physical or mental impairment which imposes an additional and significant work-related limitation of function, and (3) that the claimant have deficits in adaptive functioning which initially manifested during the developmental period. In his opinion, the ALJ appears to concede that Kimbleton satisfied the first element, though he cast aspersions on the IQ score result due to Dr. Donaldson's statement that she seemed to be of average intelligence. He then stated that the record failed to establish that Plaintiff satisfies the third element. Plaintiff asserts that the ALJ implicitly conceded that the second element was met by also finding that she had other severe impairments such as degenerative disc disease. Defendant asserts that it was unnecessary for the ALJ to address the second element, because Plaintiff failed to meet the first.

Plaintiff argues that the evidence of record demonstrates that she had

23

lifelong mental limitations.  She points to the fact that she was held back in kindergarten twice as well as in the first grade, and that her school recommended she be placed in special education classes.  In addition, Plaintiff cites to her testimony that she suffers several limitations such as an inability to shop on her own or the accommodation of having her sister read her mail to her, as well as caselaw holding that there is a presumption that mental retardation existed prior to age 22 if it can be documented later.  In general, Plaintiff is arguing that the ALJ erred in finding that her record failed to establish that her level of functioning had *initially manifested* itself during the developmental period.  The Commissioner, conversely, argues that the ALJ was justified in finding that Plaintiff did not have *significantly subaverage general intellectual functioning*, because her testimony indicated that she had few restrictions on her activities of daily living.  The two parties are therefore arguing about different aspects of this element.

The ALJ, in his opinion, addressed at length other listings such as 12.04, 12.05B, and 12.06, including an analysis of whether Plaintiff's testimony indicated the kind of limitations on activities of daily living and social functioning covered under Listing 12.05D.  As the confusion between the two parties' arguments indicates, however, the ALJ did not give a basis for his conclusion that the record failed to establish that Plaintiff experienced significantly subaverage general intellectual functioning which initially manifested during the developmental period.  If, as Plaintiff supposes, he meant that her limitations did not manifest themselves before age 22, then it is not clear upon what evidence he drew this conclusion.  If, as

24

Defendant supposes, he meant to refer to his earlier analysis under Listing 12.05D, then it is not clear whether he intended that a failure to meet the specific Listing 12.05D qualifications implied a failure to meet Listing 12.05's general requirement of significantly subaverage general intellectual functioning.  It is also not clear upon what basis the ALJ concluded that the consultative evaluator's impression that Plaintiff's overall level of intelligence appeared to be average could be given more weight than the specific WAIS-III IQ of 70 he found upon testing, given the specific requirements established in Listing 12.05C and the fact that the ALJ apparently did not question whether the score of 70 was valid.

<u>Conclusions</u>.  For the reasons set forth above, I therefore **RECOMMEND** that this matter be **REMANDED** to the administrative law judge for further proceedings.  The administrative law judge should, in making further findings, review and address the examination report of  Dr. Robert C. Woskobnick. Furthermore, he should set forth his specific basis for finding that Kimbleton does not meet or medically equal Listing 12.05C.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the party thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the

District Judge and waiver of the right to appeal the judgement of the District Court.

*Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947

(6th Cir. 1981).  *See also*, *Small v. Secretary of Health and Human Services*, 892

F.3d 15, 16 (2d Cir. 1989).

s/Mark R. Abel

United States Magistrate Judge